EXHIBIT A

Brent R. Baker (10411)
Aaron D. Lebenta (10180)
Jonathan D. Bletzacker (12034)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
bbaker@parsonsbehle.com
alebenta@parsonsbehle.com
jbletzacker@parsonsbehle.com
ecf@parsonsbehle.com

Maranda E. Fritz (*Pro Hac Vice Pending*)
**MARANDA E. FRITZ, P.C.**
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Telephone: 646.584.8231
Facsimile: 212.344.6101
Email: maranda@fritzpc.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALPINE SECURITIES CORPORATION, a Utah corporation,<br><br>Plaintiff,<br><br>v.<br><br>FINANCIAL INDUSTRY REGULATORY AUTHORITY, a Delaware corporation<br><br>Defendant. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. 2:20-cv-00794-DBB<br><br>Judge David Barlow |

Plaintiff Alpine Securities Corporation ("Alpine"), by and through its undersigned counsel,

files this Complaint against Defendant Financial Industry Regulatory Authority ("FINRA" or

"Defendant"), a Delaware not-for-profit corporation seeking, *inter alia*, declaratory and injunctive relief against FINRA and alleges as follows:

## INTRODUCTION

1.      Alpine is a registered broker-dealer and clearing firm located in Salt Lake City, Utah and has been a member of FINRA for 35 years, since it was established in 1984.  FINRA is a self-regulatory organization ("SRO") that regulates conduct of participants in the securities industry pursuant to authority provided for in the Securities Exchange Act of 1934 (the "Exchange Act") and the Maloney Act (Pub. L. No. 75-719, 52 Stat. 1070 (1938)), which amended the Exchange Act to specifically provide for SROs to exercise regulatory authority delegated by Congress to the United States Securities and Exchange Commission (the "Commission" or "SEC").  FINRA's actions and regulatory function depend upon and are subject to approval and oversight by the Commission.

2.      In August 2019, FINRA's Department of Enforcement ("DOE") instituted a disciplinary proceeding against Alpine, pursuant to rules and regulations approved by the Commission, concerning whether Alpine had charged "unreasonable" or excessive fees.  FINRA seeks by that proceeding to expel Alpine from FINRA and, because membership is required to engage in securities transactions as a broker-dealer, to thereby destroy Alpine's business, its owners' property rights, and the livelihood of the individuals associated with Alpine.

3.      Having been named as a Respondent in a disciplinary proceeding, Alpine then had the right to defend itself in an "in-person" hearing.  FINRA's rules (approved by the Commission), as well as the Commission's rules and regulations and provisions of the Exchange Act, require that FINRA provide its members with "a fair procedure for the disciplining of members."  To meet that

obligation, FINRA agrees in its Rules and by-laws to provide a "fair procedure" to members. FINRA Rules expressly state that members are "entitled to be heard in person" to defend themselves against disciplinary charges at an *in person* hearing held before a Hearing Officer.

4.      Alpine invoked its right to defend itself and proceeded to an in-person hearing that began February 18, 2020 (the "Hearing") in Salt Lake City, Utah.  While FINRA's Department of Enforcement ("DOE") was able present six of its witnesses, including its key witness and documentary evidence, Alpine was able to present only one. The hearing was adjourned on February 22, 2020 due to an urgent personal matter affecting Alpine's counsel. The parties then in March, agreed to resume in-person proceedings in late April 2020, but the COVID-19 pandemic rendered that impossible. Since then, in a series of conferences and communications with and among the parties and before the Hearing Officer, the parties repeatedly agreed, with the exception of a few limited witnesses, to resume the Hearing *in person* at a future date.  Most recently, the parties agreed, and the Hearing Officer ordered that the Hearing resume in person on November 30, 2020.

5.      Notwithstanding that order, on November 2, 2020, without notice or an opportunity for Alpine to be heard, the Office of Hearing Officers Chief Hearing Officer Maureen Delaney *sua sponte* ordered that the remainder of the Hearing proceed on November 30, 2020 entirely by virtual means through Zoom videoconferencing.  This was purportedly pursuant to a temporary rule amendment FINRA adopted on August 31, 2020 and which took effect October 1, 2020 (the "Zoom Amendment").

6.      That order was a completely generic directive, devoid of any acknowledgement of the extensive discussions that have occurred on the issue with the Hearing Officer; the nature of

3

the particular proceeding and reasons that a virtual proceeding is not workable or appropriate; the fact that DOE has already enjoyed the opportunity to present virtually its entire case in chief in person; or the severity of the penalty and the fundamental rights implicated by FINRA's effort to obtain expulsion of Alpine. That order, and the requirement that Alpine go forward in a remote and virtual proceeding, constitute a violation of Alpine's rights in critical respects:

a) It is a breach of FINRA's agreement with its member, Alpine, that it is "entitled to be heard in person;"

b) It is a breach of FINRA's agreement with its member, Alpine, that it is entitled to a "fair procedure" because the order was entered *sua sponte* without any consideration of the unique circumstances of Alpine's situation, including the numerous witnesses and documentary exhibits involved in the proceeding and the fact that DOE had already presented much of its case in person, and because it was entered *without* giving Alpine any opportunity to be heard on the issue of proceeding virtually;

c) FINRA failed to provide Alpine a "fair procedure" in disciplinary proceedings as guaranteed in its Rules, and as required by 15 U.S.C. §78o-3(b)(8), because the order was entered *sua sponte* without any consideration of the unique circumstances of Alpine's situation, including the numerous witnesses and documentary exhibits involved in the proceeding and the fact that DOE had already presented much of its case in person, and because it was entered *without* giving Alpine any opportunity to be heard on the issue of proceeding virtually;

d) It violates Alpine's right to due process as guaranteed in the Fifth and Fourteenth Amendments to the United States Constitution in that the proceeding at issue

4

seeks to deprive Alpine of its property rights without a fair hearing;

e)      It violates Alpine's due process right under the Fifth and Fourteenth Amendments to the United States Constitution to fully and fairly confront the witnesses and evidence against it, including by meaningful cross-examination, in a proceeding aimed at effectively destroying the value of the business of Alpine;

f)      It violates Alpine's due process right under the Fifth and Fourteenth Amendments to the United States Constitution to fully and effectively present a defense to the charges against it and with the effective assistance of counsel because Alpine will either have to proceed in an inadequate and unfair virtual forum with its counsel located in different states across the country, or risk the health and safety of its representatives and counsel by asking them to travel to Utah to provide representation in the same inadequate and unfair virtual forum; and

g)      The rule amendment by which FINRA purported to order Alpine to proceed remotely was not properly promulgated as required under the Exchange Act.

7.      None of this is necessary, however, because FINRA has two appropriate options to avoid depriving Alpine of the opportunity to defend itself in a proper hearing.  First, and as has been repeatedly discussed in conferences with the Hearing Officer, it can further adjourn the proceeding with Alpine continuing to operate under the same cease and desist order to which FINRA agreed and which has been in place for the last fifteen months.

8.      In the alternative, FINRA itself has acknowledged its need to continue to conduct in-person hearings and has therefore established a "single location" in "the Washington D.C. metropolitan area" that "enables OHO to better assess public health conditions in light of the

5

4847-7324-0017.v1

evolving pandemic and provide a venue that can support the appropriate health and safety protocols" (*see* FINRA, "Coronavirus Impact on OHO Hearings," http://www.finra.org/rules-guidance/key-topics/covid-19/oho-hearings (last visited Nov. 3, 2020); *see* also FINRA, "Coronavirus Impact on Disciplinary Hearings," http://www.finra.org/rules-guidance/key-topics/covid-19/hearings/impact-on-disciplinary-hearings (last visited Nov. 3, 2020).  FINRA's website describes at length the health and safety protocols in place and the ability it has to proceed with in-person proceedings.

9.     Because proceeding virtually is unnecessary and contravenes Alpine's contractual, statutory and constitutional rights, Alpine requests entry of order and judgment declaring the Zoom Amendment invalid, declaring FINRA's order that Alpine proceed by Zoom invalid, temporarily and/or permanently enjoining FINRA from conducting the remainder of Alpine's Hearing virtually, enjoining FINRA from proceeding until the Hearing can be conducted in-person, or, alternatively, enjoining FINRA from proceeding with the Hearing until Alpine is given an opportunity to be heard on the issue of whether proceeding virtually is appropriate in this case.

### The Parties

10.     Alpine Securities Corporation is a broker-dealer and clearing firm located in Salt Lake City, Utah.  It is registered with the Commission and has been a FINRA member firm since 1984.  Alpine's principal place of business is located at 39 Exchange Place, Salt Lake City, Utah.

11.     Defendant Financial Industry Regulatory Authority is a national securities association and successor to the National Association of Securities Dealers (NASD).  FINRA is a Delaware not-for-profit corporation that exercises regulatory authority over its members, including the ability to expel members from FINRA and bar them from participating in the securities

6

industry.  FINRA's principal place of business is located at 1735 K Street NW, Washington D.C. and it conducts business throughout the United States, including in Utah.

### Jurisdiction and Venue

12.     This dispute arises under the laws of the United States, including the Constitution of the United States and the Exchange Act (15 U.S.C. §§ 78a et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201. As such, this Court has federal question jurisdiction over this dispute pursuant to 28 U.S.C. § 1331. In addition, this Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because complete diversity exists between the parties, and because this action concerns and relates to the disciplinary hearing that seeks, *inter alia,* to expel Alpine from FINRA membership and put Alpine out of business, the amount in controversy exceeds $75,000.

13.     This Court has personal jurisdiction over the Defendant because FINRA conducts its business within the state of Utah, including collecting membership fees, examining member firms located in Utah, imposing sanctions on member firms in Utah and, as particularly relevant here, conducting disciplinary hearings in Utah.

14.     Venue is proper in this jurisdiction pursuant to 28 U.S.C.  § 1391 because a substantial part of the events giving rise to the claim occurred within this jurisdiction.

### FINRA is a Regulatory Body

15.     The Exchange Act provides for a comprehensive system of federal regulation of the securities industry.

16.     The ability to punish someone for a violation of the Exchange Act was, prior to the Maloney Act, a traditionally governmental function.  Specifically, such authority was vested in the Commission.

4847-7324-0017.v1

17.     The Maloney Act, Pub. L. No. 75-719, 52 Stat. 1070 (1938), amended the Exchange Act and established the authority for the Commission to register national securities exchanges or national securities associations as self-regulatory organizations (SROs) that would, in turn, exercise oversight of the securities industry participants like broker-dealers and clearing firms. As a registered SRO, FINRA has been delegated the authority to carry out that function, subject to review and oversight by the Commission.

18.     The Exchange Act requires broker-dealers and clearing firms, like Alpine, to be a registered member of an SRO in order to conduct business in the securities industry.  15 U.S.C. §§ 78o(a)-(b) (stating that it is unlawful for any broker or dealer, including clearing firms, to engage in transactions if not registered with the Commission and that registration "shall not be effective until such broker or dealer has become a member of a registered securities association").

19.     FINRA is a successor to the NASD following its merger with the regulatory branch of the New York Stock Exchange in the early 2000s.  As a result, FINRA is the only securities association registered as an SRO with the Commission.

20.     Alpine and, indeed, any broker or dealer that wishes to conduct business in the securities industry, *must* be a FINRA member; otherwise it is "unlawful" pursuant to the Exchange Act for it to conduct business (*see* 15 U.S.C. § 78o(a)).

21.     The Maloney Act provides comprehensive statutory rules that dictate how SROs must function and grants the Commission broad authority to dictate how SROs oversee their members and exercise the statutory authority to regulate members as provided for in the Exchange Act.

22.     The Maloney Act also reflects an express delegation of authority from Congress for

8

SRO's to carry out the traditionally governmental function of enforcing provisions of the Exchange Act and the Commission's regulations promulgated thereunder.

23.     Specifically, to become a registered SRO, as FINRA is, it was required to file with the Commission an application for registration that includes all of the rules of the association that will govern its members' conduct and its regulation of members (*see* 15 U.S.C. § 78o-3(a)).

24.     An association must agree to "comply with the [Exchange Act] and its own rules," (*id.* § 78s(g)(1)(A)) and it must "enforce compliance . . . by its members and persons associated with its members" (*id.*; *see also* 15 U.S.C. § 78s(h)).

25.     Among other things, the SRO's rules must provide for the "appropriate discipline" of any member for violations of the Exchange Act, the rules of the Commission, or the rules of the SRO through fitting sanctions, including expulsion from the SRO or a bar from the industry (*id.* § 78o-3(b)(7)).  To effectuate this, the SRO's rules must also provide for "a fair procedure" for such discipline to be carried out (*id.* § 78o-3(b)(8)).  Disciplinary proceedings must "give [the member] an opportunity to defend against" charges of any violation (*id.* § 78o-3(h)).

26.     Once registered as an SRO, the SRO is subject to extensive oversight and control by the Commission (*see id.* § 78s(b)).

27.     The Commission's supervision and control over FINRA is extensive and ongoing (*see id.* § 78s(a)(3)(B)).

28.     FINRA must submit *all* proposed rule changes to the Commission for approval, and the Commission may unilaterally reject, amend, or abrogate any rule proposed by or promulgated by FINRA (*see id.* § 78s(c)).

29.     Further, the procedures and rules governing conduct of FINRA's disciplinary

proceedings are subject to oversight by the Commission to ensure compliance with the requirements of the Exchange Act, the Commission's rules thereunder, and the SRO's rules (*see id.* § 78s(d)-(e)).

30.     Therefore, all aspects of FINRA's authority to regulate its members, to take enforcement action against them to ensure compliance, and to sanction those members derives from the Exchange Act and is subject to the Commission's own oversight as the federal agency delegated such responsibility by Congress. Because FINRA, in imposing discipline on members and enforcing provisions of the securities laws regulations, is serving a governmental function and acting as an agent of the Federal Government, it is a state actor and is subject to the requirement that it provide due process of law to those who would be deprived of their livelihood and property.

### The Disciplinary Proceeding Against Alpine

31.     In August 2019, FINRA's DOE instituted a disciplinary proceeding against Alpine alleging that Alpine imposed unreasonable fees and violated FINRA Rule 2010.

32.     The basis for DOE's allegations stemmed from Alpine's decision in August 2018 to implement a new fee schedule including a monthly account fee, designed to address dramatically increased costs being imposed on the firm.  The fee schedule was intended to help to pare down Alpine's customer base which consisted largely of inactive accounts holding illiquid securities that imposed massive carrying costs on Alpine and severely restricted its ability to conduct transactions for its active customers.

33.     To effectuate the change in its business, Alpine notified customers by written notice included with their August 2018 account statement that new fees had been adopted and would be implemented.  Alpine encouraged customers to close or transfer their accounts if they wanted not

4847-7324-0017.v1

to incur the new fees.  From September 2018 through July of 2019, Alpine sent near monthly notices to their customers asking that they close their accounts and thereby avoid the monthly fee. If they did so, the fee would be waived and funds returned.

34.     As expected, this led many customers to contact Alpine because they did not want to be charged the fee.  In response, Alpine agreed to waive the fee and return any funds collected if the customer agreed to close their account and remove their securities from Alpine.

35.     In late 2018 and by early 2019, Alpine was contacted by customers and continuously waived the fee for them, returned funds collected, and closed the customers' accounts.  However, Alpine was left with numerous inactive accounts held by customers who ignored or did not respond to the fee notice, had not updated their contact information for years, and held low-value speculative positions in microcap securities.

36.     Because customers ignored or failed to respond to repeated notices, Alpine began considering other options for addressing and closing inactive, "orphaned," worthless and/or abandoned accounts.  Alpine reviewed accounts to determine if they had been abandoned, and also offered customers the opportunity to simply write-off[1] their low-value positions that could not be liquidated efficiently or in a cost-effective manner.

37.     In or around July 2019, DOE commenced an investigation relating to Alpine's fees. It then filed the disciplinary proceeding at issue here on August 5, 2019. As a sanction, DOE seeks to expel Alpine from FINRA and bar it from participating in the securities industry.

38.     According to FINRA rules, Respondent was then entitled to defend against those

---

[1] The write-off process involved selling the securities to Alpine for $0.01.  Alpine placed all securities written-off in this way into a single account and maintained records indicating from which customer each position was obtained, if Alpine had ever needed to reverse the write-off for any reason.

4847-7324-0017.v1

claims and "to be heard in person" (FINRA Rule 9261).

39.     At the time it initiated the disciplinary proceeding, DOE also sought a temporary cease and desist order that would require Alpine to return any securities moved related to the fee activity, return any funds collected from open accounts, and cease from charging the fees that had been updated in August 2018.

40.     Given FINRA's concerns, Alpine voluntarily agreed to stop imposing fees and entered into an agreed-upon cease and desist order, agreeing to reverse transactions and reimburse customers pending resolution of the issue concerning Alpine's ability to impose fees.   In accordance with that agreement with FINRA, Alpine then returned funds to customers whose accounts remained open and reversed all securities transfers that had occurred as part of Alpine's efforts to close the inactive accounts.

41.     Alpine filed an answer to DOE's complaint, maintaining that the fees charged were reasonable given Alpine's unique circumstances as one of the only remaining broker-dealers dealing with microcap securities and incurring all of the extraordinary costs associated with operating in that market; that it had, in nearly every instance, agreed to work with customers to ensure they did not ultimately have to pay any fee; and that it had not taken or liquidated a single customer security.

42.     Alpine also sought the "in person" hearing guaranteed by FINRA Rule 9261.

43.     DOE and Alpine both contemplated extensive presentations of witness testimony. DOE identified seventeen different witnesses, including Alpine's three executives and five of Alpine's customers.  Alpine identified its own executives, as well as fourteen other witnesses

including customers.[2]

44.     The parties also contemplated extensive documentary presentations.  Before the start of the Hearing, DOE identified 254 exhibits, including excel files, email correspondence, account records, and summary charts.  Alpine identified another 245 exhibits before the start of the Hearing.[3]

45.     Before the Hearing, and before the onset of the COVID-19 pandemic, the parties also engaged in motion practice concerning the remote presentation of testimony for certain witnesses.

46.     Specifically, DOE sought permission to have certain customer witnesses testify by telephone and also requested that one of Alpine's former directors, Richard Nummi, be permitted to testify telephonically.   Alpine also sought permission to present customer testimony telephonically, and ultimately the parties agreed on that point.  Alpine, however, opposed the request for telephonic testimony of Mr. Nummi.

47.     The Hearing Officer *denied* DOE's request to present testimony from Mr. Nummi telephonically, finding that his testimony would address "an issue important in this case" (i.e., the genesis of Alpine's fees) and therefore outweighed "the burden and expense of requiring him to appear in person."   The Hearing Officer's decision also noted that the expected length of his testimony alone was an important justification for requiring in-person testimony.

**Enforcement Presents Much of Its Case In Person**

---

[2] Alpine identified twenty-two witnesses, but several overlapped with witnesses identified by DOE.  The total number of unique witnesses identified was thirty-one.

[3] During the first few days of the Hearing, the parties identified a few additional exhibits.

48.     As anticipated, the Hearing began on February 18, 2020 and proceeded through the session scheduled to take place on Saturday, February 22, 2020.

49.     During that time, DOE presented testimony from six witnesses and Alpine presented testimony from one witness, whom the Hearing Officer permitted to testify amidst DOE's case-in-chief due to scheduling concerns.

50.     DOE's lead witness, Stacie Jungling, testified over the course of three days and reviewed numerous exhibits, including extensive analyses of Alpine's customer accounts that formed the basis for DOE's entire case, as well as voluminous email records.  This was not insubstantial, as her testimony accounted for approximately 30% of the ten days allotted for the Hearing.

51.     DOE's other witnesses testified for several hours each and, likewise, reviewed numerous detailed exhibits.

52.     Alpine's sole witness – the *only witness it has presented in person* – testified for less than three hours, including cross-examination.

53.     During the February 22 session, DOE began presentation of its seventh witness. Approximately one hour into testimony, Alpine's counsel was informed of an urgent family matter that required that she leave Utah.

54.     The Hearing Officer granted Alpine's request for an adjournment for this reason and DOE did not object.

55.     Thereafter, on March 12, 2020, the Hearing Officer entered an order scheduling the Hearing to resume in-person on April 30, 2020.

**Further Postponement Due to COVID-19**

14

56.     On March 30, 2020, the Hearing Officer issued an order postponing the April 30 Hearing due to the COVID-19 pandemic and set a status conference for April 29, 2020.

57.     Prior to the April 29 status conference, DOE filed an informal request to resume the Hearing in-person during the week of July 6, 2020, and suggested that if it were not possible to proceed in-person, it would be appropriate to proceed virtually.

58.     During the April 29, 2020 status conference, the parties discussed the logistics of resuming the Hearing and the potential for remote testimony.  The Hearing Officer prefaced the discussion by advising DOE that no decision would be made on proceeding entirely by virtual means unless DOE filed a formal motion.

59.     Notably, neither at that point nor since has DOE ever filed a motion to have the proceeding conclude through virtual presentations.

60.     At the April conference, the Hearing Officer also advised that FINRA was making available a Zoom platform to conduct hearings remotely "as an option."  There was no suggestion that any party would be ordered to proceed in that manner absent motions, briefing, and an opportunity to be heard on the issue.

61.     Alpine expressly stated that it objected to any continuation of the entire remainder of the Hearing by remote means.

62.     In response, DOE's counsel inquired whether the Hearing Officer would set tentative dates to resume by virtual means.

*63.*     The Hearing Officer advised DOE that they would have to make a motion and "layout your explanations as to how this really – I mean we have a lot of witnesses to hear from and this is a case with a lot of documents, so you need to be specific as to how and *why you think*

15

*we can have a fair hearing and give respondent a fair opportunity to present their defense in a case like this while proceeding remotely"* (emphasis added).

64.     In response to further inquiry from DOE about setting a tentative date to resume by remote means, the Hearing Officer reiterated that "Right now, I am not going to order the parties to proceed remotely on this hearing.  You can file a motion…We have agreed to the July dates [for in-person].  I want us to agree to an alternative set of in-person dates."

65.     Alpine reiterated that it would not consent to proceed remotely.

66.     The Hearing Officer declined to hear either party's position during this conference. Thus, although it does not appear on the record, Alpine's objection to proceeding remotely was based largely on the fact that Alpine's most critical witnesses, Alpine's executives, were yet to testify and the majority of documentary exhibits would be explored with those witnesses.[4]  Alpine understood that this would present a serious challenge to any effective examination.  Alpine also believed that, similar to its opposition to the telephonic testimony of its former director, Mr. Nummi, that telephonic testimony of such important witnesses would undermine the Hearing Panel's ability to evaluate the testimony and the credibility of those witnesses.

67.     Following this discussion, the parties agreed to alternative dates to resume the Hearing in-person, one starting July 7, 2020 and the other beginning August 5, 2020.

68.     On May 19, 2020, the Hearing Officer issued an order further postponing the Hearing due to COVID-19.  In that Order, she set a tentative in-person resumption date of August 5, 2020 and directed the parties to prepare to discuss continuing the hearing by virtual means at a

---

[4] Indicative of the magnitude of this testimony, DOE had, prior to the Hearing, deposed each of Alpine's executive officers *twice*, each session lasting multiple days.

conference scheduled for June 3, 2020.

69.     During the June 3, 2020 status conference, the parties again discussed the presentation of testimony by remote means.  The Hearing Officer advised the parties that FINRA was evaluating resumption of in-person hearings and had alternatively developed the capability to proceed with Hearings, at the participants' option, by Zoom videoconference.

70.     Alpine indicated it would not consent to proceed through the "document intensive" remainder of the proceeding entirely by virtual means.

71.     The Hearing Officer indicated this would not be ordered, but that the parties should consider the presentation of at least some witnesses by virtual means in order to advance the proceeding.

72.     The Hearing Officer also ordered the parties to participate in an off-the-record test run on the Zoom platform, which occurred on June 18, 2020.  A follow-up status conference was set for July 2, 2020.

73.     The Zoom test run was not without difficulty.  During the presentation of documents, for example, the video frame displaying the witness is reduced to a thumb nail, making it difficult if not impossible to view the witness's reaction and demeanor.  The parties also encountered difficulties zooming in on certain aspects of document and using annotation features to draw the witness's attention to a particular aspect of the document.

74.     That same day, June 18, 2020, the Officer of Hearing Officers assigned case administrator notified the parties that FINRA had determined to postpone all in-person proceedings until at least after Labor Day 2020 due to the ongoing COVID-19 pandemic.

75.     At the outset of the July 2, 2020 status conference, the Hearing Officer explained

that FINRA had postponed in-person hearings until Labor Day 2020 and was unlikely to be able to provide in-person hearings at different locations through the country, but was establishing a single facility at which in person hearings would proceed.  When the Hearing resumed, she added, it would likely be at that FINRA location in the Washington, D.C. area.

76.     FINRA did, in fact, create such a location, and continues to advertise its availability and usefulness, as well as the health and safety protocols in place, on its website.  Those protocols include a space "large enough to allow social distancing," clean and sanitized rooms and workstations, separate break out rooms, microphones and displays for witness and evidentiary presentations, and plexiglass dividers between the parties.

77.     During the July 2, 2020 status conference, there was *no* discussion about the possibility of proceeding with the entirety of the Hearing by virtual means.

78.     This was, of course, consistent with the Hearing Officers prior statements that DOE would have to make a formal motion to proceed *entirely* by virtual means and Alpine would be given an opportunity to respond in writing, followed by oral argument.  It was also consistent with her prior statements that the Zoom videoconference was merely an "option."

79.     The parties did discuss virtual testimony of a subset of witnesses whom the Hearing Officer had previously ordered could testify telephonically (i.e., FINRA's customer witnesses and Alpine's customer witnesses). DOE also noted its intent to make a motion allowing presentation of Mr. Nummi's and another witness' testimony remotely.

80.     Before concluding the conference, the parties also discussed some of the exhibit-based issues that arose during the Zoom trial run on June 18, 2020.

81.     Although the Hearing Officer indicated that FINRA had remedied some of those

issues, the process explained was both burdensome – involving multiple data uploads and downloads before and during the testimony, as well as screen-switching – and, in DOE's own view "more complicated than necessary."

82.     On July 6, 2020, the Hearing Officer issued an order setting the Hearing to resume in-person on September 16, 2020.

83.     On July 15, 2020, DOE filed a motion seeking permission (again) to present Mr. Nummi's testimony telephonically and to present testimony of Robert Ishak remotely.

84.     Far from basing its motion on any urgent need to resume the Hearing generally, DOE claimed only that Mr. Ishak had unique personal circumstances preventing him from traveling. Mr. Nummi, DOE claimed, would soon no longer be subject to FINRA's jurisdiction and, thereafter, it would be impossible to compel his testimony.

85.     Alpine opposed the motion, reiterating that Mr. Nummi, also a witness for Alpine, was an important witness whose testimony should be taken in person and that he had indicated his willingness to participate regardless of jurisdiction.

86.     Before Alpine submitted its opposition, however, the Hearing Officer held a status conference on July 20, 2020 to discuss further postponement of the in-person portion of the Hearing as well as to confirm scheduling for the remote testimony.  At no point did she suggest that the Hearing would be ordered to proceed entirely by virtual means.

87.     In fact, near the conclusion of the conference, the opposite was discussed.  DOE inquired whether additional "in-person" dates should be selected for later in the year given FINRA's proposal that all in-person hearings would proceed in one central location.

88.     The Hearing Officer rejected this and, instead, instructed the parties to be prepared

to address remote testimony at the next conference.

89.     Another status conference was held on July 30, 2020, in which the Hearing Officer considered and granted DOE's motion to present remote testimony of *only* Mr. Nummi and Mr. Ishak.

90.     In that conference, the parties also agreed to set another tentative date to resume the Hearing in-person on November 30, 2020 and the Hearing Officer again advised that in-person hearings would likely take place in a central location near Washington, D.C.

91.     DOE asked the Hearing Officer what would occur if a necessary participant for the Hearing was traveling to the in-person hearing from a state on which the jurisdiction for the hearing location imposed a mandatory quarantine.

92.     The Hearing Officer stated that "We would probably postpone the hearing."

93.     She went on to explain that FINRA intended to check the public health situation in the jurisdiction for the hearing, as well as the jurisdictions of each participant at least six weeks prior to the hearing start date and it would make a determination "whether we have the potential to go forward….it's possible that FINRA would have to cancel…So at the six point [sic] mark we make a call and the call would either be yes or no…So each week it's subject to potentially being postponed."

94.     The Hearing Officer also asked the parties about their positions regarding completing the hearing entirely remotely.

95.     DOE indicated that its position had not changed, it was willing to proceed entirely virtually.

96.     Alpine objected and stated that it also had not changed its position that a virtual

20

Hearing would impede its ability to defend itself.

97.      Alpine emphasized "the importance of remaining witnesses, issues concerning credibility of those witnesses" and that "the end result of this, the result that's being sought by FINRA is a death penalty for the firm."  Alpine also noted that there was nothing urgent requiring resolution of this matter; Alpine's conduct was still subject to a cease and desist order, agreed to by FINRA and by Alpine, that had been in place for approximately one year since the inception of the disciplinary proceeding.  Pursuant to that order, Alpine was not imposing any of the fees at issue.  In fact, through the hearing FINRA was seeking no change of Alpine's fees or procedures other than those contained in the cease and desist order.  Rather, it was seeking the firm's expulsion and reimbursements of remaining amounts that were not reversed under the cease and desist order (i.e., those levied on closed accounts).

98.      DOE, notably, did not proffer any response to Alpine's assessment that the circumstances, apart from the pandemic itself, had not changed.

99.      On July 31, 2020, the Hearing Officer ordered Mr. Nummi to provide testimony by telephonic means given the impending lapse of jurisdiction over him.  She also ordered the Hearing to resume in-person beginning November 30, 2020.

100.     No order was issued regarding any other remote testimony.

**The Parties Proceed with Limited Remote Testimony for Some Witnesses**

101.     During the month of August, the parties proceeded to take remote testimony from two of FINRA's customer witnesses, FINRA's employee Mr. Ishak, Mr. Nummi, and one of Alpine's former employees, Randall Jones, whom Alpine agreed could testify remotely.

102.     None of the witnesses' testimony was longer than a few hours and only a handful

of documents were introduced.

103.    During Alpine's cross-examination of the witnesses, they repeatedly indicated they could not hear Alpine's counsel, required questions to be repeated, and had difficulty navigating the exhibits presented.

104.    Similarly, the court reporter had to ask both parties' counsel to repeat questions, and objections, and then had to ask the Hearing Officer to repeat rulings on those objections.

105.    Further, during the testimony of Mr. Nummi – whom the Hearing Officer had previously noted would offer "important" testimony – Mr. Nummi's connection timed-out of the videoconference in the middle of his testimony and the parties had to wait several minutes for him to rejoin, at which point the substantive topic had to be re-explored to ensure no testimony was lost.

106.    In short, the process was problematic and reinforced Alpine's concerns that certain issues may not have been fully captured on the record.

107.    At the conclusion of these sessions, the Hearing Officer issued an order on September 18, 2020 setting a status conference for November 2, 2020 to prepare for the in-person Hearing set to resume in the Washington D.C. area on November 30, 2020.

**FINRA *Sua Sponte* Orders the Hearing to Proceed Remotely**

108.    On November 2, 2020, and prior to the parties' scheduled status conference, without any FINRA motion or Alpine having an opportunity to be heard, FINRA's Chief Hearing Officer Maureen Delaney issued a generic order directing the remainder of Alpine's Hearing to proceed on Zoom on November 30, 2020 (the "Zoom Order").  It made <u>no</u> reference to any specific

aspects of the case or to the Hearing Officer's repeated rejection of DOE's suggestion that it proceed remotely.  A true and correct copy of the Zoom Order is attached hereto as *Exhibit 1*.

109.    By virtue of that Zoom Order, DOE would have had the ability to present most of case-in-chief, including its key witness and documentary evidence, in person, while Alpine would be forced to present the critical defense case and defense witnesses through remote means.

110.    On November 3, 2020, the Hearing Officer issued an order implementing the Zoom Order and directing the parties to prepare for resumption of the Hearing on November 30, 2020 by videoconference on Zoom (the "November 3 Order").  A true and correct copy of the November 3 Order is attached hereto as *Exhibit 2*.

111.    According to the Zoom Order, the Chief Hearing Officer's decision was based on SR-FINRA-2020-027, a temporary amendment to FINRA Rule 9261 (the "Zoom Amendment"). The Zoom Order fails to consider any of the unique circumstances of this Hearing that, as the Hearing Officer had observed, make it difficult to proceed by virtual means while ensuring Alpine's right to a fair procedure.

### The Zoom Amendment is Improperly Promulgated

112.    Prior to the Zoom Amendment, FINRA Rule 9261 guaranteed a respondent's right "to be heard *in person*."

113.    The Zoom Amendment was filed with the Commission on August 31, 2020 as a "non-controversial" proposed rule change under 15 U.S.C. § 78s(b)(3)(A)(iii) and 17 C.F.R. § 240.19b-4(f)(6) that would take effect immediately, before the Commission approved or disapproved it or the industry and interested parties could comment on it, on October 1, 2020.

114.    The Commission filed the Notice of Filing and Immediate Effectiveness of a Proposed Rule Change (the "Notice of Proposed Rule Change") on September 9, 2020 at 85 Federal Register 55712.  A true and correct copy of the Notice of Proposed Rule Change is attached hereto as ***Exhibit 3***.

115.    Section 78s(b)(3)(A)(iii) refers to rule changes that are designated by FINRA as "concerned solely with the administration of the [SRO]."  Notably, the phrase "non-controversial" appears nowhere in the statute.

116.    Section 240.19b-4(f)(6) (sometimes "Rule 19b-4") provides for immediate effectiveness where the rule "does not significantly affect the protection of investors or the public interest, does not impose any significant burden on competition, and, by its terms, does not become operative for 30 days after the date of filing."  Like Section 78s(b)(3)(A)(iii), this rule does not use the phrase "non-controversial."

117.    The Zoom Amendment, which amends a procedural rule applicable to disciplinary proceedings (FINRA Rule 9261), does not qualify for immediate effectiveness under 15 U.S.C. § 78s(b)(3)(A)(iii) and Rule 19b-4 thereunder.

118.    For example, the SEC Release that adopted the relevant amendments to Rule 19b-4 to allow for "immediate effective" rule filings in certain circumstances states, "for policy reasons, a proposed rule change that would reduce public representation in the administration of the affairs of an SRO or that would ***amend the procedures for arbitration or disciplinary proceedings would not be a proper candidate to become effective under Section 19(b)(3)(A).***" *See* Securities Exchange Act Release No. 43-35123 (December 20, 1994), available at https://www.sec.gov/rules/final/19b4.txt.

24

119.    Additionally, FINRA's designation of the Zoom Amendment as immediately effective, supposedly because it does not affect the public interest or impose any burden on competition, is patently erroneous.

120.    The public interest is, without question, affected by changes to disciplinary proceeding procedures where those proceedings involve the potential to deprive a participant of its property rights.

121.    Moreover, the federal government has repeatedly, including through executive orders, noted the importance of keeping businesses open and operating, not taking aggressive regulatory positions that could result in the closure of businesses, and taking steps to ensure and enhance the due process protections afforded to litigants in regulatory enforcement proceedings. *See* Office of the President – Office of Mgmt. & Budget, "Implementation of Section 6 of Executive Order 13924," M-20-31 (Aug. 31, 2020); Executive Order on Regulatory Relief to Support Economic Recovery, EO 13924 (May 19, 2020) (regulators should "commit[] to fairness in administrative enforcement and adjudication" and "[a]dministrative enforcement should be free of unfair surprise").

122.    In the Notice of Proposed Rule Change for the Zoom Amendment, FINRA claims that it has had difficulty, due to the COVID-19 pandemic, meeting "its statutory obligations to protect investors and maintain fair and orderly markets."  *See* 85 Fed. Reg. 55712, 55713 (Sep. 9, 2020).

123.    It is also unclear how speeding along through a virtual hearing that will potentially close a broker-dealer currently providing services to investors across the country in the middle of

undisputedly volatile and unstable securities market furthers FINRA's "statutory obligations to protect investors and maintain fair and orderly markets."

124.    The Notice of Proposed Rule Change also does not address the impact of the Zoom Amendment on members' rights to a fair proceeding or the guarantee of an "in person" hearing contained in Rule 9261.

125.    Instead, FINRA claims that it has experience with remote proceedings and has encountered logistical difficulties in organizing in-person proceedings due to local and state COVID-19 protocols.   FINRA has expressed no consideration for or concern over the actual fairness to the member litigants; it focuses solely on itself.

126.    The issue of fairness to members is directly related to the requirements in Rule 19b-4(f)(6) that the proposed rule change not "significantly affect … the public interest" and "not impose any significant burden on competition."

127.    Alpine is not aware of any other member firm that has been *ordered* without opportunity to be heard to proceed virtually in a disciplinary proceeding facing the penalty of expulsion.   Upon information and belief, the other virtual disciplinary proceedings have been scheduled and/or conducted to date did so upon all parties' consent. Alpine has given no such consent.

128.    Moreover, FINRA has never – in either the Notice of Proposed Rule Change, the Zoom Amendment or the Zoom Order or the November 3 Order – purported to consider or address the unique unfairness existing here of applying the Zoom Amendment retrospectively to a hearing that is already in progress, including to allow DOE the opportunity to present much of its case-in-chief "in person" – including its extensive testimony and documentary evidence purportedly

26

evidencing Alpine's alleged wrongdoing – while forcing Alpine to present the critical defense case and defense witnesses solely through remote means.

### The Zoom Amendment was Unfairly Enforced Against Alpine

129.    As the record of the Hearing makes clear, Alpine was repeatedly ensured by the Hearing Officer that it would not be forced to proceed by remote means and that DOE would have to make a motion and explain how proceeding by remote means would provide Alpine a fair opportunity to present its witnesses and its defense.

130.    Even after the Notice of Proposed Rule Change was filed, Alpine was never advised by the Hearing Officer that its Hearing might be converted.  Indeed, the parties set dates to resume in-person well-after the Zoom Amendment became effective.

131.    And the Hearing Officer herself had previously acknowledged the difficulty of proceeding with this particular Hearing by virtual means given the breadth and importance of remaining witness testimony and documentary evidence.

132.    Those concerns were not alleviated during the Zoom test run and, in fact, FINRA's purported solutions to exhibit issues led DOE to state that the Zoom process was "more complicated than necessary."

133.    Moreover, the limited remote testimony that was taken was difficult for both parties and witnesses.  One witness timed-out of the videoconference in the middle of his testimony and the parties had to wait several minutes for him to rejoin, at which point the substantive topic had to be re-explored to ensure no testimony was lost.

134.    Other witnesses could not hear questions or objections, nor could the Hearing Officer or the court reporter, requiring repetitive colloquies that both wasted time and burdened

4847-7324-0017.v1

the record.

135. In short, this about-face that directly contradicts repeated assurances from the Hearing Officer that the issue would be decided only if DOE brought a formal motion, smacks of unfairness and prejudice.

136. Alpine was not afforded any opportunity to object to the Zoom Order or the November 3 Order and such interlocutory decisions are not appealable under FINRA's rules. Thus, Alpine would have to proceed with the virtual hearing and have its due process rights completely violated before it could obtain any review.  This would deprive Alpine of meaningful review and, indeed, of any effective remedy.

## COUNT I

### (Declaratory Judgment that FINRA Breached Its Agreement with Alpine)

137. Plaintiff repeats and re-alleges the foregoing paragraphs numbered 1 through 136 as if fully set forth herein.

138. Alpine's membership agreement with FINRA constitutes an enforceable contract that incorporates FINRA's Rules and by-laws.

139. FINRA's Rules provide that FINRA may take disciplinary action against a member, but require – in accordance with the mandates of 15 U.S.C. §78o-3(b)(8) – that FINRA provide such members with a "fair procedure" and, as set out in Rule 9261, that includes the right "to be heard *in person*."

140. The Zoom Amendment does not *require* any hearing to be conducted by videoconference.

141. The Hearing Officer in Alpine's Hearing repeatedly assured Alpine that the Hearing

would not proceed by virtual means, unless DOE submitted a formal motion and Alpine was given an opportunity to respond in writing to that motion.

142.    The motion practice described by the Hearing Officer is part of the "fair procedure" provided for in the FINRA Rules.

143.    FINRA, by and through the Zoom Order issued by the Chief Hearing Officer, unilaterally and without fair notice, abandoned the motion procedure and *sua sponte* ordered Alpine to proceed with the remainder of the Hearing by videoconference.

144.    That constituted a breach of FINRA's agreement with Alpine.

145.    Further, the decision to convert the Hearing to a video proceeding without consideration of the particular circumstances of this Hearing, including the number of remaining witnesses and the volume of documentary exhibits, failed to provide Alpine with a "fair procedure."

146.    Further, the decision in the Zoom Order to retrospectively apply Zoom Amendment to a Hearing already in progress and in an inequitable manner to allow DOE to present virtually all of its case against Alpine in person, but to require Alpine to present its critical defense case and defense witnesses by remote means, fails to provide Alpine with a "fair procedure."

147.    These factors also constituted a breach of FINRA's agreement with Alpine.

148.    Alpine is entitled to a judgment declaring that FINRA has breached its agreement with Alpine by failing to provide a "fair procedure" when it issued the Zoom Order without giving Alpine an opportunity to be heard.

149.    Alpine is entitled to a judgment declaring that FINRA has breached its agreement with Alpine by failing to provide an "in person" hearing as provided for in FINRA Rule 9261.

150.    FINRA's breaches are harmful to Alpine in that they deprive it of agreed to protections in a proceeding where Alpine faces the possible sanction of expulsion from FINRA, loss of livelihood and property and, thus, the inability engage in further business in the securities industry,

151.    Alpine is entitled to injunctive relief precluding FINRA from compelling Alpine to proceed with the Hearing on the basis of these breaches or, alternatively, and at a minimum, temporarily enjoining FINRA from compelling Alpine to proceed with the Hearing on the basis of these breaches until Alpine is given a full opportunity to be heard on the issue of proceeding by virtual means.

## <u>COUNT II</u>

### (Violation of Alpine's Due Process Rights)

152.    Plaintiff repeats and re-alleges the foregoing paragraphs numbered 1 through 151 as if fully set forth herein.

153.    FINRA acts as an agent of the Federal Government pursuant to statutory obligations that FINRA admits it has pursuant to express delegations of regulatory authority from Congress to the Commission and then to FINRA, a registered SRO.

154.    FINRA is subject to federal due process requirements. *See, e.g.*, *Rooms v. SEC*, 444 F.3d 1208, 1214 (10th Cir. 2006) (holding that "[d]ue process requires" the NASD, FINRA's predecessor, to give parties fair notice prior to disciplining them) (citing *Handley Inv. Co. v. SEC*, 354 F.2d 64, 66 (10th Cir. 1965)).

155.    Every aspect of FINRA's conduct related to disciplinary proceedings is facilitated by and subject to the authorization of and overt assistance from the Commission, including that

4847-7324-0017.v1

the Commission approve FINRA's rules providing for disciplinary proceedings, approve FINRA's rules regarding sanctions, and may unilaterally amend or even abrogate FINRA's rules.

156.    Moreover, the Commission's entanglement is further evidenced by the pervasive review authority it exercises over FINRA in the context of disciplinary proceedings, including that it provides review of the outcomes of FINRA's disciplinary proceedings and sanction determinations, and may amend or reverse any such determinations.

157.    By virtue of the congressional scheme and Commission oversight of FINRA established thereunder, FINRA's "authority to discipline its members for violations of federal securities laws is entirely derivative.  The authority it exercises ultimately belongs to the SEC…." *National Ass'n of Securities Dealers v. S.E.C.,* 431 F.3d 803, 806 (D.C. Cir. 2005).

158.    In fact, the "fair procedure" that FINRA's own rules require is derived directly from the Maloney Act (*see* 15 U.S.C. § 78o-3(b)).

159.    Without the Commission's authority, FINRA could not have either adopted the Zoom Amendment or acted on it to deprive Alpine of its in-person hearing.

160.    Alpine is entitled to due process of law pursuant to the Fifth and Fourteenth Amendments to the Constitution of the United States.

161.    Alpine is thus entitled to notice and an opportunity to be heard on the very issue of whether the Hearing should proceed virtually.

162.    The Zoom Order was issued with *no* notice or opportunity for Alpine to be heard.

163.    Alpine was deprived of these rights.

164.    Alpine is also entitled to present an effective defense, which includes the right both to fully confront and cross-examine the witnesses and evidence against it, and the right to be

represented effectively by counsel.

165.    The Zoom Order fails even to account for the unique circumstance of the Hearing, as observed by the Hearing Officer, or the repeated assurances from the Hearing Officer that remote proceedings were merely an "option" and Alpine would not be forced to proceed by those means absent a formal motion and opportunity to be heard.

166.    Alpine will be further deprived of its rights to due process by giving retroactive effect to the Zoom Amendment by applying to a hearing that is already in progress to impose new and disproportionate legal consequences on, and deprivation of rights of, including by purporting to require Alpine to proceed with the presentation of its case and its witnesses remotely, after DOE was able to present its evidence and its case in person.

167.    The Zoom platform does not, as evidenced by Alpine's own experience with it, provide an adequate means to present witnesses or evidence, to cross-examine those witnesses, to present and review thousands of pages of documentary evidence, or even to make a full and accurate record of the proceedings.

168.    Moreover, Alpine's representation by counsel will suffer, as counsel will either have to risk their health and safety to travel to Utah, a current COVID-19 hotspot, to at least be present in the room with Alpine's representatives, or counsel will be scattered across multiple states and separated from the client. In either case, of course, Alpine will be stuck with the inadequate Zoom platform.

169.    Deprivation of Alpine's rights in the context of this Hearing, which carries the potential sanction of expulsion from FINRA and thus a prohibition on its conducting business in

the securities industry – a valuable property right – should not be permitted to stand and is also not even necessary under the circumstances.

170.    By acting with the authority delegated to it by Congress through the Commission under the Maloney Act, and by exercising authority belonging to the Commission, to approve the Zoom Amendment and apply it against Alpine with respect to the Hearing at issue, FINRA has deprived, and unless preliminarily and permanently enjoined, will deprive Alpine of its due process rights.

## COUNT III

### (Preliminary and Permanent Injunctive Relief)

171.    Plaintiff repeats and re-alleges the foregoing paragraphs numbered 1 through 170 as if fully set forth herein.

172.    The "fair procedure" required under FINRA's rules and the Exchange Act includes, as FINRA provides in Rule 9261, the right "to be heard in person."

173.    Due process itself requires the right to present an effective defense where a deprivation of property is at stake.

174.    Unless enjoined from proceeding with the virtual Zoom videoconference, Alpine's defense in the Hearing, which carries the potential sanction of expulsion from FINRA and thus a prohibition on its conducting business in the securities industry – a valuable property right – Alpine will suffer immediate and irreparable harm.

175.    Alpine will be forced to present its defense through a videoconference system that has been demonstrated to have serious technical and practical deficiencies, not the least of which is the ability for Alpine to properly examine and cross-examine witnesses and present documentary

33

evidence.

176.    At the conclusion of the Hearing, DOE will ask that Alpine be expelled from FINRA, thus depriving Alpine of its ability to conduct any further business.

177.    At the same time, the interlocutory Zoom Order and November 3 Order are not appealable under any of FINRA's Rules or the Exchange Act or Commission's rules.

178.    Alpine will therefore be forced to proceed without the ability to effectively present its defense, endure that injury, and proceed to have its valuable property rights deprived.

179.    The Hearing Officer recognized the unique evidentiary issues of this case that favored an in-person proceeding and DOE never disputed Alpine's assertion that there is no existing circumstance warranting the need to proceed apace with a virtual hearing at this point.

180.    FINRA has put forward no justification apart from the ongoing pandemic to justify depriving Alpine of its rights without even hearing from Alpine on the issue.

181.    The balance of the equities and hardships weighs strongly in favor of issuing an injunction in favor of Alpine.  Alpine's rights and interests to constitutional due process of law and fair procedures in an adjudicative hearing seeking a capital punishment are substantial, whereas the burden on FINRA in further postponing the Hearing until it can be conducted in-person is negligible.   Further, FINRA has already enjoyed the opportunity to present the majority of its case against Alpine in person, and the equities sharply tip in favor of allowing the Alpine the same opportunity in its own defense.

182.    Issuing an injunction to stop an unfair disciplinary process is in the public interest. There is also no conceivable countervailing harm to the public interest from postponing the hearing until it can be conducted in person given that Alpine agreed more than a year ago to cease and

desist from composition of disputed fees, and reimburse open accounts, and thus the status quo is already preserved.

183.    There is no need or reason for Alpine to now be forced to proceed without "fair procedures" and due process protections that entitle it to present an effective defense and do so "in person."

184.    Alpine is entitled to relief in the form of a preliminary and permanent injunction requiring FINRA to provide a fair process and comply with its contractual obligations and rules, which includes, at a minimum, postponing the hearing until it can be conducted in person and providing Alpine with a meaningful opportunity to be heard and present objections on the presentation of any witnesses or evidence remotely.

## COUNT IV

### (Declaratory Judgment that the FINRA Amendment is Invalid)

185.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

186.    The Zoom Amendment was required to be approved by the Commission before taking effect, unless it qualified to take immediate effect under the Exchange Act and rules thereunder.

187.    In order for the Zoom Amendment to take immediate effect and be valid to require Alpine to proceed virtually, it had to comply with Section 78s(b)(3)(A)(iii) of the Exchange Act and Rule 19b-4(f)(6) thereunder.

188.    Section 78s(b)(3)(A)(iii) provides that a proposed rule change may take immediate effect only where it is "concerned solely with the administration of the self-regulatory organization."

4847-7324-0017.v1

189.    The Zoom Amendment is not concerned solely with the administration of FINRA.

190.    The Zoom Amendment is concerned with FINRA's members, their rights in disciplinary proceedings, and their ability to defend themselves against allegations of violations of the federal securities laws.

191.    Rule 19b-4(f)(6) provides for immediate effectiveness where the rule "does not significantly affect the protection of investors or the public interest, does not impose any significant burden on competition, and, by its terms, does not become operative for 30 days after the date of filing."

192.    The Zoom Amendment does significantly affect the protection of investors and the public interest.

193.    The Zoom Amendment concerns members rights to a fair procedure, including procedural protections like the right to present an effective defense, matters coterminous with a members' constitutional rights to due process.

194.    In fact, the Zoom Amendment directly affects the constitutional rights of *all* FINRA's members, including Alpine.

195.    Such rights, including the preservation of those rights, are a matter of public interest and the deprivation of those rights is a "significant [e]ffect" of the Zoom Amendment.

196.    The Zoom Amendment also undermines the protection of investors and imposes a significant burden on competition insofar as it permits FINRA to take disciplinary action against member firms without fair procedures where such actions may result in the closure of a firm that provides a vital service to investors during an undisputedly volatile and unstable securities market.

197.    There is no doubt that investors who are customers of member firms that will be

sanctioned and closed down (as Alpine may be) through an entirely inadequate virtual forum will be harmed, not protected.

198.    Further, requiring member firms, like Alpine, to proceed by virtual means without any consideration of the unique circumstances of the particular case, as the Zoom Amendment purports to do, burdens members' abilities to serve their customers.

199.    FINRA was required to comply with the statutory prerequisites of Section 78s(b)(3)(A)(iii) and Rule 19b-4(f)(6), but has utterly failed.

200.    Any proposed immediately effective rule change can only be enforced "to the extent it is not inconsistent with the provisions of [the Exchange Act], the rules and regulations thereunder, and applicable Federal and State law.  15 U.S.C. § 78s(b)(3)(C).

201.    Retroactive application of the Zoom Amendment to a Hearing already in progress, and to impose additional disproportionate burdens on Alpine, is presumptively invalid.

202.    Alpine has been directly harmed by the Zoom Amendment and by its enforcement, including the Zoom Order, and will continue to be.

203.    Alpine is entitled to a declaration that the Zoom Amendment, and therefore, the Zoom Order, are invalid and in contravention of the Exchange Act Section 78s(b)(3)(A)(iii) and Rule 19b-4(f)(6) and therefore cannot be enforced to compel Alpine to proceed with the Hearing by virtual means.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for an order and judgment:

1.    Declaring that FINRA has breached its agreement with Alpine to provide a "fair procedure" including the opportunity "to be heard in person."

4847-7324-0017.v1

2.      Declaring that FINRA has deprive Alpine of Due Process of Law as required under the Fifth and Fourteenth Amendments to the United States Constitution.

3.      Declaring that FINRA's Zoom Amendment is invalid as contrary to Alpine's constitutional rights, arbitrary and capricious, in excess of FINRA's statutory authority, and adopted without observance of the proper procedures.

4.      Enjoining Defendant FINRA from conducting the remainder of Alpine's Hearing by videoconference on Zoom; and

5.      Granting such other and further relief as this Court deems just and proper.

Dated: November 10, 2020

Respectfully submitted,

*/s/ Aaron D. Lebenta*

Aaron D. Lebenta
Parsons Behle & Latimer

4847-7324-0017.v1